IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| ROBERT ELMO GASPAR | § | Case No. 03-62532 |
| | § | |
| | § | |
| Debtor | § | Chapter 7 |

## **MEMORANDUM OF DECISION**

This matter is before the Court to consider the "United States Trustee's Motion to Dismiss with Prejudice to Re-filing for 180 Days Based on Substantial Abuse and Cause" (the "Motion") through which the Office of the United States Trustee ("UST") seeks a dismissal of the above-referenced case upon the assertion that the granting of a discharge to the Debtor, Robert Gaspar, would constitute a substantial abuse of the provisions of Chapter 7 or that his case should otherwise be dismissed for cause. At the conclusion of the hearing, the Court took the matter under advisement. This memorandum of decision disposes of all issues pending before the Court.[1]

*Factual Background*

Robert Gaspar, a debtor in his early sixties, has been a sales representative for an Illinois after-market automobile parts distributor for the past five years. He holds a high school diploma and attended college for a little over a year in 1960-61. He uses his

---

[1] This Court has jurisdiction to consider the motion pursuant to 28 U.S.C. §1334 and 28 U.S.C. §157(a). The Court has the authority to enter a final order in this contested matter since it constitutes a core proceeding as contemplated by 28 U.S.C. §157(b).

personal automobile at a rate of approximately 41,000 miles per year to call upon potential customers throughout a designated sales area. He works on a commission-only basis. That once-steady income became sporadic as sales of after-market auto parts significantly decreased in his sales area which adversely affected his commission income.[2] He also began to miss work due to medical problems. He eventually was required to have surgery in August, 2002 which placed him on unpaid medical leave for six weeks. As his financial struggles grew, Mr. Gaspar even attempted to change careers by attending masseuse school and thereafter briefly operating a massage parlor called Vitality Massage during evening hours in an attempt to supplement his income. Not surprisingly, that effort failed and the business closed in less than six months.

After a substantial period of sporadic income and a growing inability to timely meet his living and business expenses, Mr. Gaspar began to utilize "paycheck loan" services in order to obtain advances on his accrued but unpaid commissions. As his financial problems mounted throughout 2003, he struggled to make ends meet and this struggle worsened as he assumed liability for other debts arising from a recent divorce. Finally, on December 3, 2003, he filed for relief under Chapter 7 of the Bankruptcy Code.

In his schedules, Mr. Gaspar listed secured debts of $12,717.00, an unpaid priority tax claim of $4,100.00, and general unsecured debts of $51,930.00, composed primarily of credit card, signature loan, and medical expense obligations. His schedule of income

---

[2] It is uncontested that the Debtor's annual gross income declined from $52,648 in 2001, to $37,413 in 2002 and to $27,682 for the first eleven months of 2003 prior to the filing of the bankruptcy petition.

-2-

discloses net income of $2,629.31, which does not include any tax withholding, and current expenditures of $2,243.26.[3]

After the case trustee's declaration of a "no-asset" estate and no action having been taken by the case trustee or by any affected creditor to prevent the award of a discharge to the Debtor, the UST filed the present motion, alleging that the granting of a discharge to Mr. Gaspar would constitute a substantial abuse of the provisions of Chapter 7 or alternatively requesting a dismissal for cause under §707(a). The UST based its contention upon an alleged financial ability of the Debtor to address his debts and upon certain discrepancies arising from the Debtor's schedules which the UST contends manifests dishonesty by the Debtor.

*Discussion*

Section 707(b) was added to the Bankruptcy Code "in response to concerns that some debtors who could easily pay their creditors might resort to chapter 7 to avoid their obligations." 6 COLLIER ON BANKRUPTCY ¶ 707.04 at p. 707-16 (15th ed. rev. 2003). In order to prevent creditors from utilizing the threat of this dismissal remedy against consumer debtors for unfair advantage, the statute can only be invoked through the motion of the United States Trustee or by the court itself.

Specifically, the statute provides in part that:

---

[3] This number reflects the deletion of monthly health insurance premiums as an expenditure since it is already reflected on Schedule I. However, the Debtor's income should arguably be reduced by a similar amount based upon the $2516 in actual monthly income received in the eleven months prior to the filing.

> After notice and a hearing, the court, on its own motion or on a motion by the United States Trustee, but not at the request or suggestion of any party in interest, may dismiss a case filed by an individual debtor under this chapter whose debts are primarily consumer debts if it finds that the granting of relief would be a substantial abuse of the provisions of this chapter. There shall be a presumption in favor of granting the relief requested by the debtor. . . .[4]

The Bankruptcy Code provides no guidance as to what conduct should trigger a finding of "substantial abuse" under §707(b). As the Fourth Circuit has noted, "[t]he ambiguity of the statutory language is no doubt a reflection of Congress's inability to agree on a definition of substantial abuse which would encompass [the] countervailing considerations in all situations." *Green v. Staples (In re Green)*, 934 F.2d 568, 571 (4th Cir. 1991). However, despite the fact that no particular process of evaluation has ever been endorsed by the United States Supreme Court or by the Fifth Circuit, decisions of other circuit courts of appeals have evolved from the earliest opinion endorsing a more restrictive "ability to pay" analysis[5] to subsequent decisions endorsing a broader "totality

---

[4] The term "consumer debt" is defined by the Bankruptcy Code as a "debt incurred by an individual primarily for a personal, family, or household purpose." 11 U.S.C. §101(8). In order for §707(b) to be applicable, the indebtedness of the debtor must be primarily consumer in nature. *In re Booth*, 858 F.2d 1051, 1055 (5th Cir. 1988) ["Even if the filing of the petition is in fact a substantial abuse of the bankruptcy procedure, a case may not be dismissed under this provision unless this prerequisite is satisfied."]. "The test for determining whether a debt should be classified as a business debt, rather than a debt acquired for personal, family or household purposes, is whether it was incurred with an eye toward profit." *Id*. There is no dispute that the Debtor's debts in this case are primarily consumer in nature.

[5] *Zolg v. Kelly (In re Kelly),* 841 F.2d 908, 914 (9th Cir. 1988).

of the circumstances" review[6] which "demands a comprehensive review of the debtor's current and potential financial situation."[7] Under the totality test, which this Court has previously adopted, "substantial abuse can be predicated upon either a lack of honesty, or want of need," *In re Rathbun*, 309 B.R. 901, 904 (Bankr. N.D. Tex. 2004) and this Court has previously utilized a useful distillation of the various factors considered by courts into two general areas of inquiry: (1) whether the debtor has the financial ability to make significant payments to creditors from future income; and (2) whether the debtor has exhibited a lack of honesty in dealings with creditors. *In re Rubio*, 249 B.R. 689 (Bankr. N.D. Tex. 2000).

Yet, in seeking to synthesize and then apply these various considerations in order to distinguish the victims of unfortunate financial circumstances from those culpable grifters intentionally seeking to abuse the bankruptcy system, it is easy to "miss the forest for the trees" and even courts purporting to evaluate the totality of circumstances have at times drifted away from the holistic evaluation endorsed in *Green.* As the Fourth Circuit emphasized at that time after identifying the relevant factors for its inquiry:[8]

---

[6] *See, e.g., Stewart v. U.S. Trustee (In re Stewart)*, 175 F.3d 796, 809 (10th Cir. 1999); *Green*, 934 F.2d at 572-73.

[7] *First USA v. Lamanna (In re Lamanna)*, 153 F.3d 1, 5 (1st Cir. 1998).

[8] The general considerations discussed in *Green* include: (1) whether the bankruptcy petition was filed because of sudden illness, calamity, disability or unemployment; (2) whether the debtor incurred cash advances and made consumer purchases far in excess of his ability to pay; (3) whether the debtor's proposed family budget is excessive or unreasonable; (4) whether the debtor's schedules and statement of current income and expenses reasonably and accurately reflect the true financial condition; and (5) whether the petition was filed in good faith.

> Exploring these factors, as well as the relation of the debtor's future income to his future necessary expenses, allows the court to determine more accurately whether the particular debtor's case exemplifies the real concern behind Section 707(b): abuse of the bankruptcy process by a debtor seeking to take unfair advantage of his creditors. The debtor's relative solvency may raise an inference that such a situation exists. Nevertheless, in light of the statutory presumption that a debtor's Chapter 7 petition should be granted, solvency alone is not a sufficient basis for a finding that the debtor has in fact substantially abused the provisions of Chapter 7.

934 F.2d at 572.

In other words, the fact that an individual will enjoy a degree of disposable income following the entry of a Chapter 7 discharge does not necessarily disqualify that person from Chapter 7 relief. The availability of post-petition net income is assumed by the concept of a fresh start. Just because an individual anticipates the enjoyment of disposable income which will allow him to realize a fresh start should not render him ineligible to receive one.

Thus, a proper analysis under §707(b) cannot simply mirror those calculation techniques used in Chapter 13 to determine the amount of disposable income. Instead of trying to guess the outcome of a hypothetical Chapter 13 case involving the debtor by invoking §1325(b) standards which cannot be rightfully applied in a Chapter 7 case (and thereby also avoiding the practical invocation of a means-testing mechanism for eligibility that is not yet in effect), the initial question in evaluating the projected budget of a Chapter 7 debtor in a §707(b) context is whether that debtor can reasonably expect to

enjoy in the near future a stream of income of sufficient quantity and stability that it leads one to the conclusion that the debtor is seeking to evade the just repayment of debts to his creditors by invoking the Chapter 7 process or that it would otherwise be inequitable to allow the mere exchange of the debtor's non-exempt property on the date of filing as the *quid pro quo* for the relief that a Chapter 7 discharge generally provides, i.e., protection of the debtor's future income from the future collection practices of his creditors. That initial determination shall either be corroborated or contradicted by consideration of the remaining factors. Such an approach will help to identify truly dishonest debtors while fulfilling the intended effect of the stated presumption in the text of the statute.

The evidence in this case does not suggest that this Debtor possesses a financial capacity which, when combined with the effect of a Chapter 7 discharge, will constitute an abusive use of the bankruptcy process. If it were not for the availability of a homestead owned by his new bride, this Debtor would likely still be facing monthly insolvency notwithstanding the entry of a discharge order. The schedules give a reasonably accurate picture of the Debtor's financial condition. In fact, the stability of the Debtor's future income is subject to reasonable doubt, given his age and health. There is also no suggestion that the Debtor's budget contains excessive or unreasonable expense projections. This evidence simply cannot be reasonably read to support a conclusion that Mr. Gaspar will have successfully abused the bankruptcy process if he is granted a general discharge under Chapter 7.

Yet the UST contends that such a conclusion is warranted because various errors in the Debtor's schedules have been identified. The Debtor admittedly failed to list the transfer to his daughter of one dining room set valued at $1800 which occurred some two and one-half months prior to filing.[9] He also initially failed to schedule a set of books of nominal value which he inherited from his father's estate, a television, and various knick-knacks, all of which were subsequently scheduled and claimed as exempt without objection.[10]

This court can neither condone nor excuse the inaccurate scheduling of assets. It is a fundamental principle that any person who seeks to obtain the benefits provided by the Bankruptcy Code has an absolute and continuing duty to provide an honest, accurate and comprehensive disclosure of his or her financial status. A debtor is therefore required to exercise a high degree of diligence in order to insure the accuracy of information in the

---

[9] The Debtor explained in a credible and convincing manner regarding his daughter's "entitlement" to her grandfather's table and chairs which was designated to be inherited by her (see Exhibit I) but which was utilized for a time by the Debtor with her permission while he was maintaining a separate residence after his divorce. He tendered it to its "rightful owner" in September, 2003 when he established housekeeping with his fiancé.

[10] The UST also complained of the Debtor's valuation of a scheduled undivided 1/6 future interest in the Minnesota home of his stepmother and his scheduling of certain medical bills which may have been satisfied, in whole or in part, by medical insurance proceeds. However, the Debtor's valuation of the fractional future interest is reasonable and credible in light of the undisputed fact that his stepmother is in good health and retains a life estate in that homestead, and given that a significant value reduction should properly be recognized for a minority ownership interest which cannot presently be realized and which arises in the context of an inheritance to be divided among various family members. This conclusion is buttressed by the fact that the trustee questioned the Debtor regarding this interest and elected to take no action. The Debtor's scheduling of the medical bills was also reasonable in light of the fact that he had been directly billed on the obligations and was uncertain as to the degree, if any, to which the insurance company had actually tendered payment for the outstanding medical bills.

schedules. However, omissions in schedules do occasionally occur and, though certainly such omissions could possibly be indicative of a fraudulent intent, they can also be the result of simple human error by either the debtor or his/her attorney. The fact that errors are made in that process does not necessarily equate to an intent by a debtor to abuse the bankruptcy process.[11]

This Court has carefully evaluated the omissions which occurred in this case and the Debtor's explanations for them.[12] While the omissions appropriately raised an alarm and triggered a deeper inquiry, the entirety of the circumstances simply do not justify a conclusion that this Debtor engaged in conduct with an actual intent to perpetrate a fraud either upon his creditors or upon this Court. The Court carefully observed the Debtor's demeanor on the stand and, unsurprisingly for a man in his sixties enduring financial ruin,

---

[11] Actually, in Chapter 7 cases, the primary guardian of that gate is the assigned Chapter 7 trustee. In this district, we fortunately have experienced trustees in the trenches, many of whom are engaged in a bankruptcy practice as well, who are adept at probing into anomalies on the schedules and deciphering whether a malevolent intent is afoot.

[12] The UST accuses the Debtor of concealing his marriage from the trustee for some unidentified purpose. The evidence does establish that the Debtor married Ms. Frances Johnson on November 28, 2003, just five days prior to the filing of his bankruptcy case. Ms. Johnson-Gaspard did not join in the filing. Though Ms. Johnson-Gaspard was not identified as a spouse in a community property state in the statement of financial affairs also filed five days after the marriage, the Debtor's marital status is plainly revealed on his Schedule I and, contrary to the assertions of the dismissal motion, that disclosure was not contradicted by the Debtor at his 341 meeting. A close examination of that testimony reveals that, in response to the trustee's observation about the lack of a mortgage payment on Schedule J and a resulting question about where he lived, the Debtor truthfully stated that he had "moved in with his fiancé in September, 2003." At that point the proceeding tape had to be changed and the trustee subsequently returned to the record with an inadvertent mischaracterization of the Debtor's testimony. This imagined "concealment" takes on even less significance in light of the testimony procured immediately thereafter, as the trustee proceeded to ask, and the debtor clearly answered, a series of budget questions relating to the Debtor's sharing of expenses under his current living arrangement. While it is true that the Debtor never testified during the meeting that he was currently married, he was never actually asked that question.

he often seemed embarrassed, confused, and uncertain about the adversary process occurring around him. His answers often sounded curt and harsh. But he did not leave the Court with the impression that he was dishonest nor that the omissions in the schedules were intentional or the product of deceit or duplicity. Likewise, the evidence establishes no pattern of reckless spending by the Debtor in anticipation of the filing of the bankruptcy case. Nor was there any history of the Debtor living beyond his means or engaging in an extravagant lifestyle prior to seeking bankruptcy relief.

Though the problems in the schedules are troublesome to the Court, in evaluating the totality of the circumstances in this case, the Court concludes that the UST has failed to demonstrate by a preponderance of the evidence that the granting of a discharge to this debtor would constitute a substantial abuse of the provisions of Chapter 7. The Debtor cannot anticipate the receipt of any substantial stream of future income which would lead one to reasonably conclude that the shielding of that income from future collection practices of creditors would be unfair or inequitable. Nor is this Court convinced that this Debtor did anything intentionally to deceive his trustee or his creditors. The evidence as presented simply does not paint an overall picture of Mr. Gaspar as an abusive debtor seeking to gain a "head start" at the expense of his creditors. Thus, the motion to dismiss this case for substantial abuse is denied.

However, the UST also seeks to dismiss this case for cause under §707(a) as a bad faith filing. Section 707(a) provides that:

The court may dismiss a case under this chapter only after notice and a hearing and only for cause, including —

(1) unreasonable delay by the debtor that is prejudicial to creditors;

(2) nonpayment of any fees and charges required under chapter 123 of title 28; and

(3) failure of the debtor in a voluntary case to file, within fifteen days or such additional time as the court may allow after the filing of the petition commencing such case, the information required by paragraph (1) of section 521, but only on a motion by the United States Trustee.

There is considerable controversy as to whether a Chapter 7 case can be dismissed for "cause" under §707(a) based upon a finding of bad faith. Some circuit courts have held that bad faith cannot constitute "cause" for dismissal. *Neary v. Padilla (In re Padilla)*, 222 F.3d 1184 (9th Cir. 2000); *Huckfeldt v. Huckfeldt (In re Huckfeldt)*, 39 F.3d 829 (8th Cir. 1994). Other circuits have held that a §707(a) dismissal can be predicated upon a showing of bad faith. *Tamecki v. Frank (In re Tamecki)*, 229 F.3d 205 (3d Cir. 2000); *Industrial Ins. Servs., Inc. v. Zick (In re Zick)*, 931 F.2d 1124 (6th Cir. 1991). The Fifth Circuit has never expressly decided the issue, although there are indications of support from that court for a bad faith dismissal under §707(a). *Daniels v. Barron (In re Barron)*, 325 F.3d 690, 695 (5th Cir. 2003)(Jones, J., concurring) and *Matter of Little Creek Dev. Co.*, 779 F.2d 1068, 1071 (5th Cir. 1986) ["Every bankruptcy statute since 1898 has incorporated literally, or by judicial interpretation, a standard of good faith for the commencement, prosecution, and confirmation of bankruptcy proceedings."].

Bankruptcy courts within the Fifth Circuit have predicted such a result. *See, e.g., In re Carbaugh*, 299 B.R. 395, 397-98 (Bankr. N.D. Tex. 2003).

However, access to this dismissal remedy is extremely restrictive. Even the courts which have found a basis for dismissal for bad faith under §707(a) have issued warnings that such a remedy should be invoked sparingly and only in the instances of highest abuse. In the seminal case of *Zick*, the Sixth Circuit warned that such dismissal "should be confined [to] ***egregious*** cases" involving individuals with substantial means who have flaunted their wealth, maintained lavish lifestyles, and are engaging in schemes to cheat their creditors and inflict harm on others. 931 F.2d at 1129 (emphasis added).

This is not one of those rare, egregious cases which warrants dismissal for bad faith under §707(a). This case was not filed in bad faith. It was not filed as a litigation tactic arising from a two-party dispute. The Debtor has not retained substantial wealth, has not been engaged in any elaborate schemes, nor is he maintaining an extravagant lifestyle while inflicting injury on his creditors. While the Debtor's omissions in his schedules raised important concerns, those issues cannot legitimately be characterized as arising from any deceitful intent to perpetrate a fraud or to abuse the provisions of the Bankruptcy Code.[13] There was no reprehensible purpose behind the Debtor's mistakes. The omissions did not create delay for creditors or materially hinder the trustee's

---

[13] The Court must also view with a jaundiced eye any attempt to utilize §727 standards and authorities in the context of a motion to dismiss under either §707(a) or (b) for the purpose of denying a debtor the opportunity to obtain a Chapter 7 discharge without the necessity of proving an intent to defraud and other required elements.

evaluation or administration of the case. While the Debtor may not possess the most endearing personality, an examination of the evidence does not establish a pattern of conduct that could accurately be labeled as egregious. In short, this case, even with its problems, is not the type of case for which a bad faith dismissal under §707(a) is reserved. Accordingly, the UST's motion to dismiss on that basis must also be denied.

This memorandum of decision constitutes the Court's findings of fact and conclusions of law[14] pursuant to FED. R. CIV. P. 52, as incorporated into contested matters in bankruptcy cases by FED. R. BANKR. P. 7052 and 9014. A separate order has been entered which is consistent with this opinion.

Signed on 4/19/2005

*/s/ Bill Parker*

THE HONORABLE BILL PARKER
CHIEF UNITED STATES BANKRUPTCY JUDGE

---

[14] To the extent that any finding of fact is construed to be a conclusion of law, it is hereby adopted as such. To the extent any conclusion of law is construed to be a finding of fact, it is hereby adopted as such. The Court reserves the right to make additional findings and conclusions as necessary or as may be requested by any party.